UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: _____

IN RE APPLICATION OF

DEPARTMENT OF HOMELAND
SECURITY, IMMIGRATION AND
CUSTOMS ENFORCEMENT,

    *Petitioner,*

vs.

ANDRIY SHPITSEN,

    *Respondent.*

_____/

## **DECLARATION OF MANUEL E. LOPEZ DIAZ, M.D.**

I, Manuel E. Lopez Diaz, make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1.    I am a licensed, Board-Certified Emergency Medicine physician assigned to the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), ICE Health Service Corps (IHSC) as the Staff Physician at the Krome Service Processing Center. I have held this position since March 26, 2023. I have more than 30 years of experience as an emergency medicine physician working for critical access hospitals to Level I trauma centers.

2.    ICE is committed to ensuring that every person detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment while in custody. The health, safety, and welfare of those detained in its custody are among agency's highest priorities, and IHSC has protocols in place to ensure that any patient on a hunger strike within its detention facilities is promptly and appropriately

addressed and treated.

3.     As the Staff Physician at the Krome Service Processing Center, my duties include providing medical care for detainees at the facility. This declaration is made in support of the Petition filed by DHS/ICE  for involuntary administration of nutrients for Mr. Andriy Shepitsen ("Mr. Shepitsen" or "the patient"), who is detained at Krome. I am the treating physician of Mr. Shepitsen, and I make this declaration upon  a  review  of  his  medical record  and  my  examination  and treatment of him.

4.     The patient is a native and citizen of Ukraine.  He arrived at Krome on February 20, 2026 after transfer from Glades County Detention Center, for monitoring in light of his hunger strike, and continuity of care.

5.     On February 25, 2026, Mr. Shepitsen was officially declared to be on a hunger strike, having missed nine consecutive meals. His weight prior to the initiation of the hunger strike was 229 lbs..

6.     Mr. Shepitsen is on day 44 of his hunger strike and has missed 138 meals as of lunch today.  As of today's date, Mr. Shepitsen has lost 36.8 lbs., or approximately 16.07% of his initial body weight, since initiation of his hunger strike.

7.     Mr. Shepitsen states that he is on a hunger strike to protest his continued detention.

8.     Mr. Shepitsen is fluent in English, and he has been counseled by medical staff on  the effects of self-imposed  dehydration  and  starvation  on  his  body.  He has also been informed of the involuntary hydration and nutrition procedures that will be pursued by way of court order to prevent injury and/or death to himself should he continue not to eat.

9.     The medical staff has explained to Mr. Shepitsen the medical necessity to eat

to preserve his health and the medical risks of continuing his hunger strike. Other staff members have repeatedly talked to the patient in attempts to convince him to eat solid foods, liquid or bland diets, and/or drink nutritional supplements. However, Mr. Shepitsen has continued to refuse to eat solid food and/or drink nutritional supplements.

10.     I have personally explained to Mr. Shepitsen my concerns regarding his condition and the medical risks involved with a continuing lack of sufficient nourishment, especially in view of the current duration of his strike. That is, he risks significant and ongoing metabolic changes induced by his decreased nutritional intake. If he continues his hunger strike, he will reach a state of severe metabolic imbalance, with a high risk of adverse consequences such as permanent damage to his kidneys, liver, heart failure and the risk of death. Mr. Shepitsen stated to me that he would continue his hunger strike.

11.     The patient has been evaluated by a psychiatrist and displays no evidence of a psychiatric condition that would cause him not to eat or drink. His diagnosis of Bipolar Disorder does not render him incapable of making an informed decision regarding whether to eat and drink. He appears to be operating under his own free will.

12.     Medical literature reflects that metabolic imbalance, caused by fasting, is likely to result in permanent bodily damage and/or death once weight loss reaches 18% of the patient's initial weight patient. Mr. Shepitsen's loss of 16.07% initial body weight, or 36.8 lbs., from his initial body weight, within the last five weeks, greatly exacerbates risk of permanent bodily injury or death, due to the timeframe in which the weight has been lost.

13.     The following laboratory tests are obtained during a hunger strike to analyze the Patient's metabolic state, to include electrolytes and kidney function:

> a.     Complete metabolic panel. This test reveals an increase in markers of kidney function in view of any renal injury. The panel tests blood urea nitrogen

(BUN) creatinine level and proteins. It also reveals electrolyte disturbances that can lead to heart arrhythmias such as potassium, phosphate, magnesium and glucose levels. The patient's most recent lab tests reflect that his Phosphate, necessary for producing energy, is normal, but trending downward. The Chloride is also low and worsening, 90mg/dL from 92mg/dL.

b.       Complete blood count. This test reveals the hemoglobin level is stable.

c.       Urinalysis, which reveals the presence of ketones 3x, blood (none) and crystals in the urine.

d.       Thiamine levels to assess deficiency at day 14 of a hunger strike.

e.       Electrocardiogram, if the patient shows elevated potassium, which can lead to arrhythmias.

f.       Creatinine phosphokinase (CPK), which is an enzyme found inside muscle cells and is released into the blood when the muscle cells rupture. The increase in CPK can lead to rhabdomyolysis, a breakdown of muscle tissue that can fatally damage other vital organs.

g.       Prealbumin, used as a marker for nutritional status evaluation. Prealbumin will decrease over time the longer a patient fails to consume adequate nutrition, and the prealbumin level correlates with patient morbidity and mortality risk. Normal prealbumin is 15-35 mg/dL. When prealbumin falls to 5-11mg/dL, significant morbidity risks exist, and aggressive nutritional support is necessary. The patient's prealbumin level is presently 17mg/dL, and is trending downward.

14.    It is difficult to predict how long the human body can survive without food; if an individual does not have adequate fat stores, this time decreases significantly. If an individual goes without water for approximately eight to ten days, he will suffer from dementia and delirium seizures and ultimately become unconscious. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted. Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest.

15.    Based on Mr. Shepitsen's current physical condition, and the fact that he has

not had adequate nutritional intake for 44 days, it is my informed medical opinion to a reasonable degree of medical certainty that involuntary nutrition is required at this time. His lack of nutritional intake compounded by his voluntary dehydration, as demonstrated by his vital signs and physical examination, can drastically exacerbate the effects of his hunger strike. For example, today, his pulse went from 67/min lying down to 117/min standing up and his blood pressure went from 12/67mm Hg lying down to 90/60mm Hg standing, reflecting a drop in blood pressure and increased heart rate, a compensatory mechanism in which his body attempts to compensate for his lack of nutritional intake.

16. Mr. Shepitsen's condition is expected to decline as his hunger strike continues. Between the 15th and 30th day of a hunger strike, a patient may suffer neurological symptoms which are severe enough to warrant hospitalization. As noted above, Mr. Shepitsen is already exhibiting signs and symptoms of orthostatic blood pressure changes which are caused by dehydration, causing dizziness and lightheadedness. His blood pressure shows that he is hypotensive (80/60 mm Hg standing). In addition, the patient has had a decreased urinary output, which is indicative of both dehydration and hypotension.

17. Mr. Sheptisen loss of almost 18% of his pre-hunger strike body weight gives rise to the reasonable medical assumption that his condition is a medical emergency likely to result in his serious and permanent injury or death before IHSC is able to respond to the same.

18. In my professional medical judgment, if Mr. Shepitsen continues his hunger strike, it will result in permanent damage to his internal organs and has the potential to become life threatening. Metabolic imbalance, if left untreated, will cause fatal arrhythmia and/or cardiac arrest.

19. Involuntary nutrition is only pursued as necessary to prevent injury, further

dehydration, malnourishment, organ failure, or loss of life due to his self-imposed hunger strike.

20.     Involuntary administration of a nutritional supplement through a nasogastric tube will be provided to him to ensure he obtains the nutrition he needs.

21.     The issuance of a court order to perform involuntary nutrition is medically necessary to preserve and sustain Mr. Shepitsen's health, welfare, medical safety, and life.

22.     It is for these reasons that I am requesting a court order for involuntary nutrition.

23.     To ensure the patient's health, welfare, medical safety, and preservation of life, should the patient refuse to cooperate with involuntary nutrition, medical soft restraints will be required to immobilize the patient and prevent unnecessary injury to both the patient and medical staff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of April 2026.

_____
Manuel E. Lopez Diaz, M.D.
Staff Physician